## ENDICOTT JOHNSON CORPORATION

v.

## UNITED STATES.

C.D. 4787; Court No. 75-7-01897.

United States Customs Court.

Feb. 1, 1979.

Rode & Qualey, New York City (John S. Rode, Michael S. O'Rourke and Patrick D. Gill, New York City, of counsel), for plaintiff.

1. Defendant abandoned its classification under item 380.00 (as well as its alternative claim under item 382.00 covering women's or girls' wearing apparel) in view of the decision in *The Westminster Corp. v. United States*, 78 Cust.Ct. 22, C.D. 4687, 432 F.Supp. 1055 (1977). In that case, the court held that certain

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C. (David M. Cohen, Chief, Customs Section, New York City, and Madeline B. Cohen, trial attorney, Washington, D. C.), for defendant.

MALETZ, Judge:

In this case the court is called upon to determine the proper tariff classification of certain cotton canvas shoe uppers that were exported from Japan in 1972 and entered at the port of New York during the same year. Upon entry, the merchandise, described on the invoices as "Canvas Shoe Uppers," was classified by the government under Item 380.00 of the Tariff Schedules of the United States (TSUS) as " * * * other men's or boys' wearing apparel, ornamented: Of cotton" and assessed with duty at the rate of 35 percent ad valorem.

At trial, defendant abandoned its classification under item 380.00 [1] and now asserts that the merchandise is properly classifiable under item 386.04 as "Articles not specially provided for, of textile materials: * * * other articles *ornamented*: Of cotton," dutiable at the rate of 40 percent ad valorem. (Emphasis added.)

Plaintiff claims the merchandise is properly classifiable under item 386.50 as "Articles not specially provided for, of textile materials: * * * Other articles, *not ornamented*: Of cotton: * * * Other," subject to duty at the rate of 14 percent ad valorem. (Emphasis added.)

The sole question before the court is whether the two parallel rows of stitching on each side of the imported uppers known as "arch stitching" are or are not ornamental.

The pertinent provisions of TSUS read as follows:

vinyl uppers which were classified as wearing apparel and claimed to be classifiable as footwear could not be classified under either provision since the provisions in the tariff schedules for wearing apparel and footwear do not contain a "parts" provision.

**846**

Schedule 3 Headnotes:

\*   \*   \*   \*   \*   \*

3.   For the purposes of the tariff schedules—

(a) the term "ornamented", as used with reference to textile fabrics and other articles of textile materials, means fabrics and other articles of textile materials which are ornamented with—

(i) fibers, filaments (including tinsel wire and lame), yarns, or cordage, any of the foregoing introduced as needlework or otherwise, including—

\*   \*   \*   \*   \*   \*

(B) other types of ornamentation, but not including functional stitching or one row of straight hemstitching adjoining a hem;

\*   \*   \*   \*   \*   \*

Schedule 3, Part 7, Subpart B:

Subpart B headnote:

1.   This subpart covers articles, of textile materials, not covered elsewhere in the tariff schedules.

Articles not specially provided for, of textile materials:

[Defendant's claim]

Lace or net articles, whether or not ornamented, and other articles ornamented:

386.04        Of cotton .............. 40% ad val.

\*   \*   \*   \*   \*   \*

[Plaintiff's claim]

Other articles, not ornamented: Of cotton:

\*   \*   \*   \*   \*   \*

386.50        Other ................ 14% ad val.

### The Record

The record in the case consists of a stipulation of fact, the testimony of three witnesses and 15 exhibits for the plaintiff, and

**2.**   The witnesses for plaintiff were: (1) Richard Oris, General Manager of Quality Assurance for the plaintiff, Endicott Johnson Corporation, who was responsible for all inspection and testing at the plaintiff's seven shoe manufacturing plants; (2) Harold McGowan, President of the plaintiff, who was responsible for introducing the imported merchandise into the United States; and (3) John Galli, an employee of plaintiff, who was in charge of operations for plaintiff's W. T. Grant company account during the period here in issue when the uppers at bar were incorporated into basketball sneakers

three witnesses and 10 exhibits for the defendant.[2]

### Description of the Imported Merchandise

The imported merchandise consists (as previously indicated) of cotton canvas shoe uppers. These uppers were of both oxford (low-cut) and high top types and came in white and black colors in different sizes. After importation, soles were attached to the uppers, insoles and laces were inserted, and the merchandise was thereby made into sneakers.

The uppers contained two parallel rows of stitching extending from eyelets closest to the ankle of the wearer downward at a slight angle to the midpoint of the arch area. These two parallel rows of stitching are referred to in the trade as "arch stitching" and, as noted before, the sole question before the court is whether or not this arch stitching—which is depicted below—is ornamental.

ARCH STITCHING—

### Tests to Determine Strength of Uppers With and Without Arch Stitching

Samples of the imported uppers were tested both by plaintiff and by the Uniroyal company for the defendant on a Scott Tester machine to demonstrate by the so-called grab method the comparative tensile strength of the imported uppers with and without the arch stitching. On the tests conducted by plaintiff, the portions of the

plaintiff manufactured and sold to the W. T. Grant chain.

The witnesses for the defendant were: (1) Robert Chase, Division Manager of Quality Assurance for Uniroyal, Inc.—a footwear manufacturer—who was in charge of his company's testing laboratories and responsible for its return goods policy; (2) Dan McCarthy, Manager of Product Development of the Converse Rubber Co.—one of the largest manufacturers of footwear in the United States; and (3) Dr. Clifton Scaggs, a podiatrist.

uppers *without* arch stitching broke on the average at 64 pounds pressure, while the portions of the uppers *with* the arch stitching broke on the average of 102 pounds pressure. On the tests conducted for the defendant by Uniroyal, the portions of the uppers *without* arch stitching broke on the average at 70 pounds pressure, while the portions of the uppers *with* the arch stitching broke on the average at 90 pounds pressure. The conclusion drawn from defendant's tests as stated in a laboratory test report by Uniroyal was that: "The average strength at ultimate break is less on the * * * [uppers] without [arch] stitching than on the * * * [uppers] with [arch] stitching." (R. 338) [3]

*Testimony With Respect to Whether or Not the Arch Stitching Is Ornamental*

We summarize now the testimony in the record bearing on whether or not the arch stitching is ornamental. Plaintiff's first witness to testify on this aspect was its president, Mr. McGowan.

Mr. McGowan testified that he was responsible for introducing the merchandise in question into this country. This came about, he said, as a result of an agreement between plaintiff and the W. T. Grant company under which that company agreed to purchase from plaintiff, over a period of years, some 30 million pairs of sneakers utilizing the uppers in question. To carry out this agreement, the witness stated that plaintiff had to design an upper which would be suitable for a long-lasting PVC sole and which would at the same time be inexpensive enough so that the resultant pair of sneakers could meet Grant's retail price requirement of $2.99. Mr. McGowan stated that the strongest type of material for the uppers was army duck but this was far too expensive for the $2.99 retail price requirement since it would cost 25 cents a pair more than the material actually used. Thus, instead of using army duck, plaintiff utilized a 160 drill cloth with a web backing. Mr. McGowan testified that the arch stitching was added to this material—at a cost of 2½ cents per pair—to reinforce that point of the sneaker which gets the most pressure when the shoe is laced. According to the witness, the use of arch stitching by plaintiff goes back to 1937. He added that the stitches were put on the uppers to achieve "additional strength in that particular area of the shoe, which is called the arch area." (R. 167)

Continuing, Mr. McGowan testified that on the basis of his experience in the footwear industry, the arch stitching—which is white—does not serve to decorate or adorn the merchandise. According to the witness, in order for something to be ornamental or decorative, it must be readily visible. In this connection, he stated that 80 percent of the sneakers in issue were white with white stitching and since the arch stitching was also white, it was not visible unless one was very close to it. Under these circumstances, he concluded that the stitching could not be considered ornamental or decorative. He further stated that while the white arch stitching could be seen on the black sneaker, in that case it was no more decorative than the other white stitching on the shoe—which stitching is concededly nonornamental.

Mr. McGowan further testified that the arch stitching in issue was not considered ornamental by the buying public. This

---

**3.** There is a federal test for determining the breaking strength of a woven fabric by the grab method, i. e., Federal Test Method Standard No. 191, Method 5100. The record shows that that test method was not and could not be used in testing the uppers involved here because (1) the amount of fabric in the uppers is insufficient to comply with the federal test requirements; and (2) the arch stitching is on the bias and is thus not measurable by the federal test method since that method measures the strength of the warp and filling yarns.

It is to be added that a method of testing the *wearability* of an article in actual use is by wear tests in which the articles are issued to a group of persons who wear them in a variety of use conditions. Such wear tests are a way of determining the article's serviceability, comfort and consumer acceptability. The record indicates that plaintiff did not conduct wear tests on the sneakers in which the imported uppers were incorporated; the reason ascribed was that plaintiff does not conduct wear tests to determine the strength of fabrics.

fact, he said, caused plaintiff to discontinue producing the item since ornamental shoes "like the Adidas shoes and Pumas and the different types of shoes with red stripes and red stitching" took over the market. (R. 169)

On cross-examination, the witness stated that he did not believe that the white arch stitching gave the sneaker "a more expensive or classier look" (R. 222), particularly since the arch stitching on the white sneaker which represented 80 percent of the production was not very noticeable. On further cross-examination, he expressed the opinion that some customers would purchase a sneaker with arch stitching rather than one without arch stitching not on the basis that the arch stitching was ornamental, but on the basis that the arch stitching made the sneaker stronger. Finally, on this aspect, a tie-on tag attached to every pair of sneakers using the imported uppers sold by W. T. Grant contained the notation: "ARCH STITCHING INSURES UPPER STRENGTH."

Another witness for plaintiff, John Galli, an employee of plaintiff since 1964, has been engaged in large scale selling to customers such as W. T. Grant and has traveled throughout the United States to observe the retail market on a firsthand basis. As a result of his marketing background, Mr. Galli defined the term "ornamented" as used in the footwear industry as referring to something affixed to a shoe that has no utilitarian function. He testified that if stitching were primarily decorative and only incidentally utilitarian, the trade would still consider it utilitarian. The witness testified, however, that if the stitches were placed on a sneaker "primarily to enhance the appearance and to attract a customer," despite the fact that the stitches might incidentally make the upper stronger, he would consider the stitches to be decorative "if that was the intention." (R. 250) Finally, the witness testified that the arch stitching on the imported uppers was "definitely not decorative."

Defendant's first witness was Robert Chase, who as previously mentioned (note 2, supra) was Division Manager of Quality Assurance for Uniroyal in which capacity he was in charge of that company's testing laboratories and responsible for its return goods policy. Mr. Chase supervised the tests conducted by Uniroyal for the defendant to determine the strength of the uppers in issue with and without arch stitching and testified that "[i]n all instances * * * the stitched upper, had a strength in excess of the unstitched sample * * *." (R. 385) In his opinion, however, the arch stitching on the imported uppers served absolutely no utilitarian function and was placed on the upper for attractiveness or style. He testified that the arch stitching was for decorative purposes only because it did not join two parts together as did the remaining stitching on the imported uppers, which stitching he did not consider to be decorative. He stated that in order for something to be decorative it need only be visible to someone—primarily the purchaser or the wearer—but conceded that this was his "opinion at the moment" and that his opinion was not necessarily shared by the industry. (R. 309)

Mr. Chase further testified that, in his experience reviewing returned merchandise, he has not found abrasion of the arch area to be any problem whatever with sneakers. He was also of the opinion that decorative stitches do not always have to be in contrasting colors. He then went on to emphasize that the arch stitching on the imported uppers "simulates an additional reinforcement on the shoe, which, in fact, does not exist." (R. 368)

Finally, Mr. Chase agreed that forces are exerted in the area where the arch stitching is sewn and that if he wished to make an upper "more strong" he would place stitches in such an area. (R. 372)

Defendant's second witness, Dan McCarthy, Manager of Product Development of the Converse Rubber Co., testified that stitching which joined two pieces of material together was utilitarian while stitching which did not join two pieces of material together was decorative. In the witness' opinion, the arch stitching found on the

imported uppers was ornamental or decorative.

Mr. McCarthy added on cross-examination that sneakers are not ordinarily reinforced in the arch area; that the arch stitching simulates an extra piece of fabric; that in the past sneakers were made with such an extra piece of fabric on the inside for purposes of an "instep reinforcement" which added support to the instep; and that the industry at one time believed there was a need to reinforce the instep area and for that purpose placed strips inside the upper. Mr. McCarthy then testified that in some cases it is still necessary to support the arch or instep area.

The witness further stated that his company had made sneakers which had arch stitching similar to that here; that this stitching was purely ornamental and was added to make the sneaker more attractive; and that his company had never claimed in its advertising that the arch stitching had a utilitarian function of making the upper stronger.

Mr. McCarthy testified that in order for stitching to be decorative, it did not have to be visible to anyone but the purchaser or wearer. He added that ornamental or decorative stitching did not have to be in a contrasting color, but could be in the same color as the shoe. Mr. McCarthy explained that white stitching was used for ornamentation on white canvas sneakers because nonwhite stitching on an all white sneaker would detract from the eye appeal. Nonwhite stitching, he said, would cheapen the appearance of the shoe by giving it a gaudy, blatant appearance, making it less "balanced." Since balancing is an important consideration in designing sneakers, Mr. McCarthy stated that white stitching is used for ornamentation on white sneakers since it would not be consistent with the overall design or motif of the sneaker to use thread of a different color. He explained that sneakers are designed to appeal to the consumer and that, in a shoe store, white stitching on a white canvas would be readily visible to the consumer.

Defendant's final witness was Dr. Clifton Scaggs, a podiatrist who indicated that a podiatrist is a licensed specialist in the medical, surgical and orthopedic management of the human foot. Dr. Scaggs testified that the major weight-bearing portions of the foot are the ball and the heel and that the arch area of the normal foot does not bear weight in the gait cycle. He expressed the opinion that uniform arch supports found in some shoes have no utilitarian function. On cross-examination, he conceded that force was necessarily applied to the arch area of the shoe simply by putting a shoe on.

### The Law

■ As set out before, the single issue in this case is whether or not the arch stitching is ornamental. For the reasons that follow, it is concluded that plaintiff has proven by a preponderance of the credible evidence that the stitching in question is primarily functional and not ornamental.[4]

### The Arch Stitching Is Functional

Headnote 3(a)(i)(B) to Schedule 3, TSUS, specifically excludes functional stitching from the term "ornamented." See, e. g., *Baylis Brothers, Inc. v. United States*, 60 Cust.Ct. 336, 339, C.D. 3383, 282 F.Supp. 791, 794 (1968), *aff'd*, 416 F.2d 1383, 56 CCPA 115, C.A.D. 964 (1969).

The word "functional" is defined in *Webster's New International Dictionary* (2d ed., 1956), as follows:

> *functional* 1. Of, pertaining to, or connected with a function or functions; * *. 2. Performing or serving a function, as a useful purpose or special activity; designed, developed, considered, etc., with reference to a function or functioning; * * *.

4. In reaching this conclusion, the court assumes *arguendo* that the doctrine of *United States v. New York Merchandise Co.*, 435 F.2d 1315, 58 CCPA 53, C.A.D. 1004 (1970), is applicable here. Accordingly, by virtue of the government's original classification, the arch stitching in issue is presumed to be ornamental and it thus became plaintiff's burden to prove that the arch stitching is functional and not ornamental.

With these considerations in mind, the record establishes that the arch stitching in question performs the function of adding strength to the arch area of the upper. This is demonstrated by the tests of the imported uppers which make manifest that the uppers with the arch stitching were measurably stronger than the uppers without that stitching.

The record is equally clear that plaintiff caused arch stitching to be placed on each upper for the purpose of adding strength to the upper. As explained by Mr. McGowan, who was responsible for introducing the merchandise into this country, plaintiff chose to present to the public an upper which derived its added strength from the arch stitching rather than to make the upper out of unduly expensive army duck. Illustrative of how plaintiff's purpose was made known to the public is the tie-on tag containing the notation "ARCH STITCHING INSURES UPPER STRENGTH" which was placed on every pair of W. T. Grant sneakers made with the imported uppers. In this connection, the term "purpose" is used in the same sense as in *Baylis Brothers, Inc. v. United States, supra,* 60 Cust.Ct. at 341, 282 F.Supp. at 796:

We agree that in determining whether the dresses are ornamented, the evidentiary issue, as stated above, is whether the primary purpose of the stitching is for decoration rather than utility. The term "purpose" as used here, as well as in the decisions cited above, must, of course, be understood to mean function rather than the subjective intent of the manufacturers. It is the resultant effect of, and not the claimed motivation for, the stitching which determines the issue.

Here, the "claimed motivation" and the "resultant effect" converge. The "claimed motivation"—offering the public a better all-around sneaker having a strengthened upper has been shown by the testimony of Mr. McGowan, the person who started the program. The "resultant effect" of arch stitching—greater strength—was demonstrated by both parties' tests.

Indeed, plaintiff's stated purpose for adding arch stitching to the uppers was supported by the following testimony on cross-examination of defendant's witness, Mr. McCarthy (R. 458):

Q. So at one time, apparently, there was a need, or the industry felt there was a need to reinforce the instep area and, in fact, did place strips inside the upper, is that correct?—A. Correct.

Q. Is it your testimony then, that while in the past the industry felt it was necessary to support that arch area or the instep area, it is no longer so necessary?—A. No.

Q. Then there is a necessity to support that area?—A. In some cases.[5]

Thus, the testimony of record establishes that the arch stitching in issue was employed in order to manufacture a stronger upper and was used in lieu of heavier duck material which would have been too expensive. To that extent, the stitching clearly performs a functional purpose, which satisfies the literal language of head note 3(a)(i)(B), and also responds to the more stringent test enunciated in *Baylis Brothers, Inc. v. United States, supra,* i. e., the stitching is primarily functional rather than primarily decorative. By strengthening the fabric of which the uppers were made, the arch support stitching permitted the plaintiff to substitute a lower cost fabric and thereby reduce the cost of the footwear ultimately produced from the imported uppers. Clearly, achieving an economic benefit by using arch support stitching cannot be characterized as an "ornamental" or "decorative" purpose.

Defendant, however, interjects a test of necessity, rather than functionality, as the decisive criterion in determining whether the stitching in question constitutes ornamentation. The essence of defendant's argument contained in its brief is as follows (br., p. 32):

* * * It is clear that the "arch stitching" is not a necessary portion of either

---

5. It is to be noted that on redirect examination Mr. McCarthy testified that he did not think it

necessary to reinforce the instep area in a canvas sneaker. (R. 471)

the upper or the sneaker without which there would be no upper or no sneaker, nor is the upper or sneaker incomplete and unfit for the purpose for which it was designed and intended to be used without the "arch stitching." * * *

■ It is a generally established principle that stitching which is "necessary" to the completion of a garment will *conclusively* establish that the stitching is functional. *Blairmore Knitwear Corp. et al. v. United States,* 60 Cust.Ct. 388, C.D. 3396, 284 F.Supp. 315 (1968). However, defendant confuses the conclusiveness of necessity under the statutory test of "functionality" with the test of functionality itself. For, under defendant's reasoning, a shirt with pockets would be considered ornamented by virtue of the pockets alone because pockets are unnecessary for a shirt to function as a shirt. There is a basic difficulty with this reasoning, however, since the question is not whether the *upper* is functional with or without the stitching but whether the *stitching* is functional. Thus, defendant is incorrect in its assertion that the question of utility, and hence the functionality, of the stitching "depends upon its necessity." Brief, p. 5.

In short, the facts unequivocally established by the tests performed for both parties prove that arch stitching makes the fabric of the upper stronger and hence results in a stronger shoe. Furthermore, according to the witnesses responsible for the design of the shoe in issue, this was the purpose for which the arch stitching was employed.

It is also interesting to note that the Customs Service, in several published Treasury decisions, has ruled that portions of a garment which simulate a functional element of the garment do not "ornament" that garment. For example, dummy or false pocket flaps which were sewn on each side at the waistline, which flaps simulate a flap that actually would cover each pocket and which were not more decorative than a utilitarian flap were held to be not ornamental. 100 Treas.Dec. 221, 232, T.D. 56410(46) (1965). Further, simulated pockets and belt segments (100 Treas.Dec. 802, 838, T.D. 56535(168) (1965)) and eight metal buttons sewn to the front of a woman's sleeveless dress to simulate a double-breasted effect (4 Cust.Bull. 93, 96, T.D. 70–43(15) (1970)) did not cause the garment on which each of these simulated utilitarian embellishments was placed to be ornamental.

In line with these Treasury decisions, it is to be observed that quite apart from the fact that the record establishes that the arch stitching strengthens the imported uppers, defendant's witnesses themselves have reiterated that that stitching simulates functional stitches.[6]

### The Arch Stitching Is Not Ornamental

It is also concluded that the arch stitching is not ornamental within the meaning of that term as set forth in headnote 3(a)(i)(B) to Schedule 3, TSUS. With regard to this headnote, the court stated in *Blairmore Knitwear Corp. v. United States, supra,* 60 Cust.Ct. at 392–3, 284 F.Supp. at 318:

* * * [W]hile the Headnote * * * purports to define the term "ornamented", it does not actually do so. Instead it sets forth the circumstances under which fabrics and articles may be considered to be ornamented, and the types of embellishments which may accomplish that effect. As is evidenced by the introductory language, the emphasis is upon the article to be adorned or embellished, not the substantive matter of what constitutes ornamentation in the first instance.

  *   *   *   *   *   *

*The intent to make adornment the primary objective of ornamentation is thus evidenced.* It is clear both by this ex-

---

6. Thus, defendant's witness, Mr. McCarthy, testified that the arch stitching simulates an extra piece of fabric on the inside which in the past was an instep reinforcement designed to provide support to the arch. (R. 457–8) To similar effect, defendant's witness Mr. Chase testified that the arch stitching on the imported uppers "simulates an additional reinforcement on the shoe, which, in fact, does not exist." (R. 368)

press statement and the exclusion in Headnote 3(a), *supra,* of "functional stitching" that, in employing the word "ornamented", Congress did not attempt to label all braid, or all fringe, or all edging, for example, ornamentation, but only such as in fact served to provide a decorative effect.

\* \* \* \* \* \*

Moreover, a distinction must be drawn between that which finishes, joins, serves a utilitarian purpose, and only incidentally ornaments, and that which primarily adorns, embellishes, or ornaments. [Emphasis added.][7]

As the court stated in *Colonial Corp. of America v. United States,* 62 Cust.Ct. 502, 504–5, C.D. 3815 (1969):

\* \* \* The general rule is that whether or not an article is "ornamented" or "decorated" is a question of fact to be determined with reference to the particular article before the court. \* \* \* It is the results produced upon the article, and not the method of production, which determines the classification. \* \* \* Thus the important question is not what is the particular article being ornamented, but rather what is the effect on that article when some additional and nonfunctional feature is added to it.

It thus remains a question of fact as to whether or not the primary effect of the arch stitching is that of adornment or decoration. And reviewing the record before us in that light, it must be concluded that adornment or decoration is not the arch stitching's primary effect. Significant in this respect is Mr. McGowan's testimony that 80 percent of the sneakers in issue were white with white arch stitching and that since the arch stitching was also white, it was not readily visible. Examination of the sample supports this testimony. Furthermore, although the white arch stitching is readily visible on the black sneakers, its decorative effect is minimal because it is virtually identical in appearance to the other stitching on the upper, which is concededly nonornamental. In fact, defendant's witness Mr. McCarthy agreed that the arch stitching on the upper is "consistent with the overall design or motif of the upper." (R. 459)

It is to be added that defendant's two witnesses testified that, in their opinion, the arch stitching on the imported upper was ornamental and not functional. Their views were based on a belief that in order to be functional, stitching must hold or bind two pieces of material together. However, as we have previously seen, this simply does not conform with the meaning of "functional" as applied to the facts of this case.

In summary, the merchandise is not "ornamented" because arch stitching is not ornamental. A visual inspection of the uppers in issue reveals that the arch stitches are not more visible or decorative or colorful than the other stitches on the uppers. And even if the utility of arch stitching had not been shown, it is clear from the cases which have treated the ornamentation issue that because arch stitching does not adorn or embellish the upper in a commercially meaningful manner, the stitch is not ornamental.

For example, in *United States v. Mutual China Co. et al.,* 9 Ct.Cust.Appls. 232, T.D. 38202 (1919), the court held that embossed configurations on certain crockery articles had not been brought to that degree of embellishment as to be "ornamented" or "decorated" within the statute. As the court stated: "Certainly neither every deviated line nor undulated surface can be said to be an ornamentation or decoration, although pleasing to the eye." *Id.* at 234.

Further, in *Will & Baumer Candle Co., Inc. v. United States,* 21 Cust.Ct. 149, C.D. 1146 (1948), the court held that three vertical lines on a glass receptacle (holding a

7. *Webster's New International Dictionary* (2d ed., 1956) defines ornament as follows:

2.a. That which is added to embellish or adorn; that which adds grace or beauty; an embellishment; a decoration.

4. Addition or inclusion of anything that beautifies; ornamentation; embellishment; decoration.

candle used in connection with a sanctuary lamp) were not ornamental since they were not "substantial and sufficient to amount to an ornament or decoration." *Id.* at 152.

Clearly distinguishable is *Colonial Corp. of America v. United States, supra,* 62 Cust.Ct. 502, where a double row of non-functional reddish stitching placed on the back of girls' blue denim shorts was found to be ornamental. In that case, the stitching was eye catching; was conspicuous; and, even from a view of the sample, was obviously decorative. In the present case, by contrast, the arch stitching is not eye catching; is not conspicuous; and is not obviously decorative.

### Conclusion

For the foregoing reasons, the court concludes that the imported uppers are, as claimed by plaintiff, properly classifiable under item 386.50 as "Articles not specially provided for, of textile materials: * * * Other articles, not ornamented: Of cotton: * * * Other," dutiable at the rate of 14 percent ad valorem. Judgment will be entered accordingly.

Murray Sklaroff, New York City, for plaintiff.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C. (Susan C. Cassell, Trial Atty., Washington, D. C.), for defendant.